The State of CONNECTICUT, ex rel. Richard BLUMENTHAL, Attorney General, Plaintiff,

v.

Erin CROTTY, Commissioner of Environmental Conservation, and Larry Johnson, Director, Department of Environmental Conservation, Division of Law Enforcement, Defendants.

Vivian I. Volovar, Plaintiff,

v.

John P. Cahill, Commissioner of Environmental Conservation; Donald W. Brewer, Director, Department of Environmental Conservation, Division of Law Enforcement; Gordon Colvin, Director, Department of Environmen-

tal Conservation, Marine Resources Division; Richard Otterstadt; Gary Enright, Environmental Conservation Officer; and New York Department of Environmental Conservation, Defendants.

Nos. 1:01–CV–1719(FJS/DRH), 1:99–CV–718(FJS/DRH).

United States District Court, N.D. New York.

Dec. 13, 2001.

Office of Attorney General of the State of Connecticut (Mark P. Kindall, Asst. Atty. Gen., of counsel), Hartford, CT, for the State of Connecticut.

Office of Attorney General of the State of New York, Environmental Protection Bureau (Gregory J. Nolan, Asst. Atty. Gen., of counsel), New York City, for Erin M. Crotty, Larry Johnson, John B. Cahill, Donald W. Brewer, Gordon Colvin, Richard Otterstadt, Gary Enright, and the New York State Department of Environmental Conservation.

Purtill, Purtill & Pfeffer, P.C. (George M. Purtill, Esq., Seth Jacoby, Esq., of counsel), South Glastonbury, CT, for Vivian I. Volovar.

Debevoise & Plimpton (Steven S. Michaels, Esq., of counsel), New York City, for Amici Fishers Island Lobstermen's Association, Inc. and Fishers Island Conservancy, Inc.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

### I. INTRODUCTION

Presently before the Court are motions for a preliminary injunction in two actions, *Connecticut v. Crotty*, 1:01–CV–1719, and *Volovar v. Cahill*, 1:99–CV–718.[1]

The Court heard oral argument in support of, and in opposition to, these motions on December 10, 2001. At the close of argument, the Court reserved decision. The following constitutes the Court's determination of the pending motions.

### II. BACKGROUND

In April 1998, the State of Connecticut, as *parens partriae*, brought suit against the New York Commissioner of Environmental Conservation and the Director of the Division of Law Enforcement for the New York Department of Environmental Conservation, alleging that their continued enforcement of New York Environmental Conservation Law § 13–0329(2)(a), which prohibits non-resident lobstermen from lobstering in New York waters adjacent to Fishers Island, violated the Commerce Clause of the United States Constitution. In May 1999, Vivian Volovar, a Connecticut resident engaged in the lobstering trade, filed a similar suit, alleging that the enforcement of § 13–0329(2)(a) violated the Privileges and Immunities Clause of

---

1. The Court consolidated these two actions for purposes of hearing oral arguments on the present motions because both motions seek a preliminary injunction to prevent the enforcement of the emergency regulations which took effect on November 5, 2001.

Article IV, Section 2 of the United States Constitution, the Privileges or Immunities Clause of the Fourteenth Amendment to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

On February 2, 2001, this Court entered judgment in favor of the State of Connecticut and Ms. Volovar, finding that the enforcement of § 13–0329(2)(a) violated the Commerce Clause, the Privileges and Immunities Clause, the Privileges or Immunities Clause, and the Equal Protection Clause. *See, generally,* Memorandum–Decision and Order, dated February 2, 2001. Based upon its findings, the Court enjoined the further enforcement of the discriminatory provisions of § 13–0329(2)(a) and, in *Volovar v. Cahill,* found that the individual Defendants were not entitled to qualified immunity.[2] *See id.*

On November 5, 2001, Connecticut residents engaged in the lobstering trade, including Ms. Volovar, received a notice that the New York Department of Environmental Conservation ("NYDEC") had adopted emergency regulations, which took effect on November 5, 2001. The notice indicated that the emergency regulations would "remain in effect for a period of 90 days, unless they were extended or adopted permanently by the Department." *See* Notice to Holders of Commercial Lobster and Food Fish Licenses and other Interested Parties ("Notice") at 1.

The emergency regulations contain several provisions, including one that creates the Fishers Island Special Management Area ("FISMA"), a special management area around Fishers Island, with restrictions on commercial lobstering operations. As stated in the regulations, the purpose of the FISMA is "to protect the reef's lobster population from degradation due to increased fishing pressure, and to maintain the balance that has historically existed among the commercial lobster fishery, the lobster population and the reef community." *See* Declaration of Gregory J. Nolan, dated December 3, 2001, at Exhibit "A." The emergency regulations also require that "(1) ... any person commercially fishing lobster pots within FISMA must obtain a special permit to do so, **and must not take lobsters from any other waters;** ..." *See* Notice at 1 (emphasis added). In addition, these regulations restrict the total number of lobster pots each permittee may set in the FISMA as well as the number of lobster pots each permittee may fish on each trawl.

In response to the emergency regulations, the State of Connecticut filed a new action, 1:01–CV–1719, against the same defendants, seeking a declaration that the provision of the emergency regulations that requires that anyone who has a FISMA permit must surrender his rights to take lobsters from any other waters (the "extraterritorial provision") is unconstitutional, void and unenforceable. In addition, the State of Connecticut seeks a temporary and permanent injunction preventing Defendants from enforcing that provision. At the same time that it filed its complaint, the State of Connecticut moved, by order to show cause, for a preliminary injunction. Ms. Volovar also brought a motion, by order to show cause, seeking the same relief.

The specific provision of the emergency regulations at issue is that "(1) ... any person commercially fishing lobster pots within FISMA must obtain a special permit to do so, and **must not take lobsters from any other waters;** ..." *See* Notice at 1 (emphasis added). According to the

---

**2.** There is an appeal pending before the Second Circuit in *Volovar v. Cahill.*

emergency regulations, this special requirement will be enforced as follows "c) requirement that all FISMA permit holders fish for lobster **only in the FISMA area,** and that they fish no more than 300 lobster pots or their current allocation, whichever is less—**enforceable as of December 15, 2001;** ..." *See id.* at 2 (emphasis added). The regulations also require that "(6) [a]ll persons who currently fish pot gear within the boundaries of FISMA must either obtain the FISMA permit or remove their gear from the area by **December 15, 2001.** Persons who obtain FISMA permits must comply with all requirements of the emergency rule, including **removing all gear set in other waters, by January 1, 2002.**" *See id.* (emphasis added).[3] Finally, under these regulations, although "[i]n 2001, FISMA permits are available to any holder of a N.Y. State Resident or Non–Resident Commercial Lobster Permit[,][i]n 2002 and thereafter, FISMA permits will only be available to persons who held them during the preceding year." *See* Notice at 1. Therefore, unless Ms. Volovar and other lobsterers elect to obtain a FISMA permit, and thereby surrender their right to lobster in all other waters, by December 31, 2001, they will be forever barred from lobstering in the FISMA.

In support of their motions for a preliminary injunction, Plaintiffs argue that the extraterritorial provision of the emergency regulations violates the Commerce Clause and that its enforcement will cause them irreparable harm. The Court will address these issues in turn.

## III.  DISCUSSION

■ A party seeking a preliminary injunction must demonstrate both "(a) [i]rreparable harm; and either (b)(1) [a] likelihood of success on the merits; or (2)[s]ufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly towards the party requesting the preliminary relief." *Tri–State Video Corp. v. Town of Stephentown,* No. 97–CV–965, 1998 WL 72331, *2 (N.D.N.Y. Feb. 13, 1998) (citations omitted). When, as here, "a party seeks to stay a governmental action or regulatory scheme, the Second Circuit has held that only the 'likelihood of success' standard applies." *Id.* (citation omitted).

### A.  Irreparable harm

■ "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 153 (2d Cir.1999) (quoting *Rodriguez v. DeBuono,* 162 F.3d 56, 61 (2d Cir.1998) (per curiam) (internal quotation marks omitted)).

Ms. Volovar asserts that the harm she will suffer if her motion is not granted is actual and imminent because once she makes an election—either to lobster only in the FISMA (and, thus, to surrender her right to lobster in any other waters) or not to lobster in the FISMA—"she will forever be prevented from fishing in both such areas[.]" *See* Volovar's Memorandum of Law at 7.[4]

---

**3.** At oral argument, counsel for the State of New York informed the Court that although lobsterers must remove their gear from the FISMA by December 15, 2001, they have until December 31, 2001 to apply for a FISMA permit.

**4.** In her affidavit, Ms. Volovar states that since February 2, 2001, she has lobstered in the FISMA and that she sets 75% of her lobster pots in the FISMA and 25% of her lobster pots in Connecticut waters. *See* Affi-

In addition, the State of Connecticut argues that the harm it will suffer cannot be measured or compensated in monetary damages because it cannot bring an action to obtain compensatory damages for its citizens who, like Ms. Volovar, will be injured by the effect of the extraterritorial provision of the emergency regulations. Rather, the State of Connecticut may assert only an independent "quasi-sovereign" interest "in the health and well-being, both physical and economic—of its residents in general" and "in not being discriminatorily denied its rightful status within the federal system." *See* State of Connecticut's Memorandum of Law at 7 (quoting *Alfred L. Snapp & Son v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). Thus, the State of Connecticut argues that this interest, by its very nature, cannot be compensated by monetary damages because the State of Connecticut is limited to prospective injunctive relief.

Based upon the record, the Court concludes that Ms. Volovar and the State of Connecticut have demonstrated that the harm they will suffer if the Court denies their motions for a preliminary injunction is both imminent and actual and irreparable.

**B.  Likelihood of success on the merits**

■ The Supreme Court has established "what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). Under this approach, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out-of-state interests," courts have generally invalidated the statute without

any further inquiry. *Id.* at 579, 106 S.Ct. 2080 (citations omitted). On the other hand, when a state statute "has only indirect effects on interstate commerce and regulates evenhandedly," courts have looked to see "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). With these general principles in mind, the Court will examine whether Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims that the extraterritorial provision of the emergency regulations violates the Commerce Clause.

Plaintiffs assert that the State of New York's attempt to condition an applicant's ability to take lobsters from the FISMA on that person's surrendering his rights to engage in commercial lobstering in any other waters, including those beyond the jurisdiction of the State of New York, is clearly improper. *See* State of Connecticut's Memorandum of Law at 9 (citing *Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)). Specifically, Plaintiffs argue that the extraterritorial provision of the emergency regulations fails the test set out in *Healy* because it attempts to control commerce that takes place wholly outside of New York's borders.

Moreover, Plaintiffs contend that the extraterritorial provision of the emergency regulations impermissibly discriminates against interstate commerce in purpose and effect. Although Plaintiffs acknowledge that this provision is facially neutral as between interstate and intrastate commerce in the lobstering trade, they argue that the effect of the extraterritorial provision is plainly discriminatory. Plaintiffs

davit of Vivian Volovar, sworn to December 6, 2001, at ¶¶ 2–3.

maintain that New York has historically discriminated against non-resident lobsterers desirous of fishing in the waters surrounding Fishers Island in an attempt to reserve those waters for the exclusive use of persons living on that island. Moreover, according to Plaintiffs, the extraterritorial provision of the emergency regulations "attempt[s] to achieve indirectly what the Court determined [New York] could not accomplish directly: the exclusion of out-of-state lobstermen from the waters surrounding Fishers Island." *See* State of Connecticut's Memorandum of Law at 12.

Plaintiffs concede that the emergency regulations contain many provisions that clearly relate to a legitimate conservation purpose, such as limits on the number of lobster pots each permittee may set in the FISMA. However, Plaintiffs argue that the extraterritorial provision cannot be justified by this legitimate conservation purpose. Rather, according to Plaintiffs, this provision is "simply a punitive measure, intended and designed to discourage out-of-state residents from applying to obtain the new FISMA permits." *See id.* at 13. Thus, Plaintiffs assert that "the law impermissibly discriminates against interstate commerce in violation of the Commerce Clause." *See id.*

In response, Defendants argue that Plaintiffs' challenge to the extraterritorial provision of the emergency regulations fails because that provision applies equally to all lobsterers, whether they are Connecticut or New York residents. Although Defendants acknowledge that the extraterritorial provision of the emergency regula-

tions burdens commerce, they argue that it does not burden interstate commerce because it affects in-state and out-of-state interests exactly the same. Moreover, Defendants assert that although the extraterritorial provision of the emergency regulations does have an impact beyond New York, this impact is incidental to the purpose of the regulations as a whole.

Although not directly on point, the Supreme Court's decision in *Healy v. Beer Institute*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), provides a useful framework for analyzing the validity of the extraterritorial provision of the emergency regulations at issue in this case. The statute at issue in *Healy* required out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers were, at the time of posting, no higher than the prices at which those products were sold in the bordering states of Massachusetts, New York and Rhode Island.[5] The Court began by noting that in *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), it had found that a similar statute violated the Commerce Clause because it amounted to extraterritorial regulation of interstate commerce. *See Healy*, 491 U.S. at 332, 109 S.Ct. 2491.[6] The Court explained that in *Brown–Forman*, it reaffirmed and elaborated on its established view that "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy*, 491 U.S. at

---

**5.** During the relevant time period, Connecticut had no brewery of its own. Therefore, brewers and importers were referred to collectively as "out-of-state shippers."

**6.** The statute at issue in *Brown–Forman* required every liquor distiller or producer selling to wholesalers within the State of New York "to affirm that the prices charged for

every bottle or case of liquor [was] no higher than the lowest price at which the same product would be sold in any other State during the month covered by the particular affirmation." *Healy*, 491 U.S. at 331–32, 109 S.Ct. 2491 (citing [*Brown–Forman,*] 476 U.S. at 576, 106 S.Ct. at 2083).

332, 109 S.Ct. 2491. The Court reasoned that " '[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.' " *Healy*, 491 U.S. at 334, 109 S.Ct. 2491 (quoting [*Brown–Forman* ] at 582, 106 S.Ct. at 2086 (footnote omitted)).

The Court further explained that its cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions

> **First**, the "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," ... and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states," ... **Second**, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.... **Third**, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.... And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.

*Healy*, 491 U.S. at 336–37, 109 S.Ct. 2491 (internal citations and citation and footnote omitted) (emphasis added).

The Court in *Healy* also found that the Connecticut statute violated the Commerce Clause because, on its face, the statute discriminated against brewers and shippers of beer engaged in interstate commerce. The Court found that the statute "applies solely to interstate brewers or shippers of beer, that is, either Connecticut brewers who sell both in Connecticut *and* in at least one border State or out-of-state shippers who sell both in Connecticut and in at least one border State." *Id.* at 341, 109 S.Ct. 2491. Similarly, the Court found that

> [u]nder the statute, a manufacturer or shipper of beer is free to charge wholesalers within Connecticut whatever price it might choose so long as that manufacturer or shipper does not sell its beer in a border State. This discriminatory treatment establishes a substantial disincentive for companies doing business in Connecticut to engage in interstate commerce, essentially penalizing Connecticut brewers if they seek border-state markets and out-of-state shippers if they choose to sell both in Connecticut and in a border State.

*Id.*

Therefore, the Court concluded that although Connecticut claimed that its price-affirmation statute was designed to ensure the lowest possible prices for Connecticut consumers, that justification was "not advanced by, in effect, exempting brewers and shippers engaging in solely domestic sales from the price regulations imposed on brewers and shippers who engage in sales throughout the region." *Id.*

Arguably, the extraterritorial provision of the emergency regulations at issue in this case inflicts more of a burden on interstate commerce than the statute at issue in *Healy*. In the former case, the statute did not regulate the price that out-of-state shippers could charge to wholesalers for their products in the border states, and it did not prohibit them from engaging in trade in the border states as a prerequisite for selling beer to wholesalers in Connecticut. Nonetheless, the Court found the effect of the statute on interstate commerce to be objectionable and violative of the Commerce Clause.

The regulations in this case go even further than the statute in *Healy*. The extraterritorial provision affirmatively conditions a person's right to lobster in the FISMA upon his agreement to surrender his right to engage in the commercial lobster trade in the waters of any other State. Therefore, applying the general principles set forth in *Healy* to this provision, the Court concludes that although the extraterritorial provision of the emergency regulations does not discriminate on its face, the effect of the provision is to impermissibly regulate the commercial lobster trade beyond the borders of New York State. In addition, not only does the extraterritorial provision establish a substantial disincentive to lobsterers who want to fish in the FISMA to engage in the commercial lobstering trade in interstate commerce, it affirmatively prohibits them from doing so.

As such, this provision would appear to violate the Commerce Clause.[7]

■■ Alternatively, even if the Court were to conclude that the extraterritorial provision of the emergency regulations was not discriminatory, the result would be the same. As noted above, nondiscriminatory statutes; i.e., those that " 'regulate[ ] evenhandedly with only "incidental" effects on interstate commerce,' " are analyzed under the balancing test which the Supreme Court set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 499 (5th Cir.2001) (quoting [*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Oregon*, 511 U.S.] 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979))). Under this test, a statute is valid "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844 (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852). The Court in *Pike* explained that "[i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

---

7. The cases that Defendants cite to support their position were either decided before the Supreme Court rendered its decision in *Healy* or they are entirely inapposite to this case. *See Ford Motor Co. v. Insurance Comm'r of Commonwealth of Pa.*, 874 F.2d 926 (3d Cir. 1989) (*"Ford Motor Co.-Pennsylvania "*) (pre-*Healy* ); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (pre-*Healy* ); *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir.1994) (involving a conflict-of-law issue and finding that it was "the parties' own agreement which operated to project the New Jersey law outside of New Jersey's borders, ...."); *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493 (5th Cir.2001) (*"Ford Motor Co.-Texas "*) (involving a statute that only prohibited automobile manufacturers from engaging in retail sales in Texas, not in other states).

It is undisputed that the emergency regulations as a whole serve a legitimate purpose—conservation of the FISMA's lobster resources. The question is whether the extraterritorial provision of the emergency regulations furthers this purpose and, even if it does, whether this purpose could be promoted with a lesser impact on interstate activities.

The record before the Court is devoid of any evidence to support Defendants' contention that the extraterritorial provision promotes the emergency regulations' purpose of conserving the FISMA's lobster resources. Defendants assert that without this provision "a considerable number of lobsterers who have not traditionally fished in the FISMA area" would apply for FISMA permits. *See* Defendants' Memorandum of Law at 22. However, when asked what the basis for this assertion was at oral argument, Defendants could point to nothing in the record to support this contention. In fact, according to Defendants' own figures, which are before the Court, as of November 19, 2001, Defendants had sent out only twenty-four applications for FISMA permits and as of December 7, 2001, they had received only seventeen completed applications. *See* Declaration of Gregory J. Nolan, dated December 3, 2001, at ¶ 3; Affidavit of Gordon Colvin, sworn to December 7, 2001, at ¶ 2. In addition, there is no evidence in the record with respect to how many FISMA permits Defendants could issue and still promote their legitimate interest in conserving FISMA's lobster resources. Moreover, and perhaps most importantly, Defendants have not proffered any evidence to demonstrate that there is any correlation between their purpose of conserving FISMA's lobster resources and the extraterritorial provision's absolute prohibition against lobstering in all other waters, including waters outside of New York's borders.

If, as stated, the conservation of FISMA's lobster resources is the purpose of the emergency regulations, then it seems that this interest could be promoted by other measures that would have a lesser impact on interstate activities. For example, Defendants could limit the number of pots that each lobsterer could set in the FISMA to less than 300. In addition, Defendants could legitimately differentiate between those who lobster only in the FISMA and those that lobster in the FISMA as well as in other waters by permitting those in the former group to set more pots in the FISMA than those in the latter group. Finally, Defendants could limit the number of FISMA permits they issue each year and assign those permits either by a lottery or on a first-come-first-serve basis. These examples are not intended to be an exhaustive list of possible alternatives. Defendants are certainly entitled to adopt other methods that would promote the goal of conserving FISMA's lobster resources as long as those methods do not violate the Commerce Clause by unduly burdening interstate commerce.

Therefore, it appears likely that the burden imposed upon interstate commerce by the extraterritorial provision is excessive in relation to the putative conservatory benefits of the emergency regulations. Accordingly, for the reasons stated above, the Court finds that Plaintiffs have established a likelihood of success on the merits and grants Plaintiffs' motions for a preliminary injunction and enjoins Defendants from enforcing the extraterritorial provision of the emergency regulations.

## IV.  CONCLUSION

After carefully considering the parties' submissions and oral arguments, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiffs' motions for a preliminary injunction are **GRANTED**; and the Court further

**ORDERS** that Defendants are enjoined from enforcing the provision of the emergency regulations that requires FISMA permit holders to fish for lobsters only in the FISMA.

**IT IS SO ORDERED.**