**AMERICAN BOOKSELLERS FOUN-DATION FOR FREE EXPRES-SION, et al., Plaintiffs,**

v.

**Howard DEAN, in his official capacity as Governor of the State of Vermont, et al., Defendants.**

No. 1:01–CV–46.

United States District Court,
D. Vermont.

April 18, 2002.

Michael A. Bamberger, Sonnenschein, Nath & Rosenthal, New York, NY, Charles Platto, Nolan C. Burkhouse, Sarah S. North, Law Office of Charles Platto, Norwich, VT, for American Booksellers Foundation for Free Expression, Ass'n of American Publishers, Freedom to Read Foundation, National Ass'n of Recording Merchandisers, Northshire Info., Inc., PSINet Inc., Recording Industry Ass'n of American, Inc., Sexual Health Network, Inc.

David Seth Putter, Putter & Edson, LLP, Montpelier, VT, Michael A. Bamberger, Sonnenschein, Nath & Rosenthal, New York, NY, Markus Brakhan, Law Office of Markus Brakhan, Burlington, VT, Charles Platto, Nolan C. Burkhouse, Sarah S. North, Law Office of Charles Platto, Norwich, VT, for American Civil Liberties Union of Vermont.

Joseph Leon Winn, Vermont Attorney General's Office, Montpelier, VT, for Howard Dean, William H. Sorrell, Lauren Bowerman, Dan M. Davis, Keith W. Flynn, Dale O. Gray, James A. Hughes, Vincent Illuzzi, James McKnight, James P. Mongeon, Joel W. Page, John Quinn, George E. Rice, Robert L. Sand, Terry Trono, William Wright.

**MEMORANDUM OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MURTHA, Chief Judge.

Plaintiffs, a variety of businesses and membership-based advocacy organizations that use the Internet to communicate, display, and access a broad range of speech and ideas, challenge the constitutionality of two Vermont statutes which criminalize the distribution to minors of any image or written material in an electronic format that is sexually explicit and which is found "harmful to minors." *See* Vt.Stat.Ann. ("V.S.A.") tit. 13, §§ 2802, 2802a (1998 & 2001 Supp.). Plaintiffs have not been charged or threatened with charges under either statutory provision, but claim they are overbroad and, therefore, impermissibly chill free speech rights under the First Amendment. Plaintiffs communicate over the Internet within and outside the state of Vermont, and their online speech can be received within and outside Vermont. Thus, Plaintiffs also contend the provisions violate the Commerce Clause. Plaintiffs seek a declaratory judgment and an injunction permanently barring Defendants—various Vermont State officials in their official capacities—from enforcing the two provisions. Defendants seek dismissal for lack of standing, or, alternatively, judgment as a matter of law.

On February 6, 2002, the Court conducted a one-day consolidated bench trial. *See* Fed.R.Civ.P. 65(a)(2). For the reasons explained in greater detail below, the Court concludes:

*First,* Plaintiffs Sexual Health Network, Inc. and American Civil Liberties Union ("ACLU") of Vermont have proven the elements of standing to challenge 13 V.S.A. § 2802a, but lack standing to challenge 13 V.S.A. § 2802. Plaintiffs American Booksellers Foundation For Free Expression,

Association of American Publishers, Freedom to Read Foundation, National Association of Recording Merchandisers, Northshire Information, Inc., PSINet, Inc., and Recording Industry Association of America failed to present evidence necessary to prove their standing to challenge either statutory provision.

*Second,* neither abstention nor certification is warranted in this case.

*Third,* on its face, 13 V.S.A. § 2802a violates the First Amendment and the Commerce Clause of the U.S. Constitution, and these violations constitute irreparable injury.

The Court, therefore, **PERMANENTLY ENJOINS** Defendants from enforcing 13 V.S.A. § 2802a.

## I. *Introduction*

Vermont's prohibition of the distribution of indecent or obscene materials to minors has a long history. *See* Frederick F. Schauer, *The Law of Obscenity* 10 (1976) (observing that in 1821, Vermont became the first state in the United States to enact an obscenity statute exclusive of political or religious purpose). By 1973, the Vermont General Assembly enacted 13 V.S.A. § 2802, prohibiting the distribution or sale of sexually explicit material to minors which is found to be "harmful to minors" under the three-part definition established

in *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See* 13 V.S.A. §§ 2801(6), 2802 (1998).[1]

On May 18, 2000, Defendant Howard Dean, in his capacity as Governor of the State of Vermont, signed into law Act No. 124, "An Act Relating to Internet Crimes." *See* 2000 Vt.Acts & Resolves 124. As its title suggests, Act No. 124 expanded 13 V.S.A. § 2802 to cover the Internet transmission to minors of sexually explicit, "harmful to minors" material. As amended, the provision read as follows:

§ 2802 DISSEMINATING INDECENT MATERIAL TO MINORS

(a) No person may, with knowledge of its character and content, sell, lend, distribute or give away to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image, *including any such representation or image which is communicated, transmitted, or stored electronically,* of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; . . . .

2000 Vt.Acts & Resolves 124 § 7 (amended language emphasized); *compare* 13 V.S.A. § 2802 (1998).[2] In addition, Section 1 of

---

1. In *Ginsberg,* the Supreme Court upheld a state law prohibiting the sale to minors of sexually explicit materials that were found "harmful to minors" under a specific, three-part definition. The *Miller* decision set forth basic guidelines for states to follow when attempting to proscribe the distribution of obscene materials to adults and minors. The *Miller* decision modified the *Ginsberg* definition. Since a conformity amendment in 1973, Vermont has not altered the following definition of "harmful to minors":

   (6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct,

sexual excitement, or sado-masochistic abuse, when it:

   (A) Predominantly appeals to the prurient, shameful or morbid interest of minors; and

   (B) Is patently offensive to the prevailing standards in the adult community in the state of Vermont as a whole with respect to what is suitable material for minors; and

   (C) Is taken as a whole, lacks serious literary, artistic political, or scientific value, for minors.

   13 V.S.A. § 2801(6) (1998).

2. The statutory terms "nudity," "sexual conduct," "sexual excitement," and "sado-maso-

Act No. 124 amended 13 V.S.A. § 2, Vermont's criminal law jurisdictional provision, to read:

§ 2 CRIMES COMMITTED PARTLY OUTSIDE STATE

A person who, with intent to commit a crime, does an act within this state in execution or part execution of such intent, which culminates in the commission of a crime either within or without this state, shall be punished for such crime in this state in the same manner as if the same had been committed entirely within this state. *A crime committed by means of an electronic communication, including a telephonic communication, shall be considered to have been committed at either the place where the communication originated or the place where it was received.*

2000 Vt.Acts & Resolves 124 § 1 (amended language emphasized); *compare* 13 V.S.A. § 2 (1998). Act No. 124 took effect on July 1, 2000.

On February 7, 2001 Plaintiffs sought declaratory and injunctive relief in this Court, claiming that Act No. 124's changes to 13 V.S.A. §§ 2 and 2802 violated their rights under the First Amendment and Commerce Clause. When Plaintiffs' complaint was filed, at least four state laws containing similar content-based restrictions on Internet communications had been struck down or enjoined on First Amend-

ment or Commerce Clause grounds. *See PSINet, Inc. v. Chapman,* 108 F.Supp.2d 611 (W.D.Va.2000); *Cyberspace, Communications, Inc. v. Engler,* 238 F.3d 420, 2000 WL 1769592 (6th Cir.2000) (table), *aff'g* 55 F.Supp.2d 737 (E.D.Mich.1999); *Am. Civil Liberties Union v. Johnson,* 194 F.3d 1149 (10th Cir.1999), *aff'g* 4 F.Supp.2d 1024 (D.N.M.1998); *Am. Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997). Three of these four decisions relied on the reasoning and findings contained in *Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), in which a unanimous Supreme Court declared unconstitutional under the First Amendment a new federal statute, the Communications Decency Act ("CDA"), Pub.L. No. 104–104, § 502. The CDA criminalized the transmission to minors over the Internet of "indecent" messages, 47 U.S.C. § 223(a) (Supp. V 1999), as well as the display, in a manner available to minors, of material that is "patently offensive" as measured by "contemporary community standards," 47 U.S.C. § 223(d)(1) (Supp. V 1999).

In reaching its decision, the *Reno* Court adhered to long-standing precedent, including *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), where the Court upheld a state law prohibiting the sale to minors of sexually explicit materials that were considered obscene as

chistic abuse," are defined by Vermont law as follows:

(2) "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernably turgid state.

(3) "Sexual conduct" means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area,

buttocks or, if such person be a female, breast.

(4) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(5) "Sado-masochistic abuse" means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

13 V.S.A. § 2801(2)–(5) (1998).

to minors, but not as to adults. *See Reno* 521 U.S. at 864–65, 117 S.Ct. 2329. The *Reno* Court thus reaffirmed that government has " 'a compelling interest in protecting the physical and psychological well-being of minors' which extend[s] to shielding them from indecent messages that are not obscene by adult standards." 521 U.S. at 869, 117 S.Ct. 2329. Ultimately, however, the Court distinguished the statute at issue in *Ginsberg* and concluded the CDA was not the least restrictive alternative to further the government's compelling interest. *See id.* at 876–79, 117 S.Ct. 2329. Significantly, the Court's decision turned on its recognition of major differences between speech in cyberspace and speech in "brick and mortar" space—namely, there is no effective way to determine the age of users who seek access to material over the Internet, and it is too burdensome for noncommercial website operators to verify the age of their users. *See id.* at 876–77, 880, 117 S.Ct. 2329.

During the 2001 legislative session, evidently aware of Plaintiffs' lawsuit and of the potential constitutional infirmities created by Act No. 124, the Vermont General Assembly passed Act No. 41. *See* 2001 Vt.Acts & Resolves 41.[3] Act No. 41 changed existing law in two ways. First, 13 V.S.A. § 2802 was again amended, this time to read as follows:

### § 2802 Disseminating indecent material to *a minor in the presence of the minor*

(a) No person may, with knowledge of its character and content, sell, lend, distribute or give away to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image, including any such representation or image which is stored electronically, of a person or portion of a human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

(c) *This section shall apply only to acts occurring in the presence of the minor.*

13 V.S.A. § 2802 (1998 & 2001 Supp.) (emphasis added).[4]

Second, the Vermont legislature created an entirely new statutory provision, 13 V.S.A. § 2802a, which reads as follows:

### § 2802a Disseminating indecent material to a minor outside the presence of the minor

(a) No person may, with knowledge of its character and content, and with actual knowledge that the recipient is a minor, sell, lend, distribute or give away:

(1) any picture, photograph, drawing, sculpture, motion picture film or similar

---

**3.** In enacting the new law, the General Assembly expressly acknowledged

that the U.S. Constitution may impose certain requirements on the dissemination of indecent material to minors through electronic communication that do not apply when the dissemination occurs in the presence of a minor. Because Internet communication is often anonymous, a person may not be capable of accurately ascertaining

the age of a person with whom they are communicating.

2001 Vt.Acts & Resolves 41 § 1 ("Legislative Intent").

**4.** *Compare* 2001 Vt.Acts & Resolves 41 (indicating that "communicated" and "transmitted" were deleted from previous § 2802(a)(1)).

visual representation or image, including any such representation or image which is communicated, transmitted, or stored electronically, of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; or

(2) any book, pamphlet, magazine, printed matter, however reproduced, or sound recording which contains any printed matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

(b) No person may, with actual knowledge of the character and content of a motion picture, show or other presentation, including such motion picture, show or presentation which is communicated, transmitted, or stored electronically, which, in whole or in part, depicts nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors:

(1) exhibit such a motion picture, show or other presentation to a minor; or

(2) sell or give away to a minor an admission ticket or pass to premises whereon there is exhibited or to be exhibited such a motion picture, show or other presentation.

(c) This section shall only apply to acts occurring outside the presence of the minor.

13 V.S.A. § 2802a (2001 Supp.).

Sections 2802 and 2802a have remained unchanged since they went into effect on July 1, 2001. As it stands today, there are three affirmative defenses available under both provisions:

(1) [Where] the minor as to whom the offense is alleged to have been committed exhibited to the accused a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that the minor was eighteen years of age or older; or

(2) [Where] the defendant was in a parental or guardianship relationship with the minor; or [where] the minor was accompanied by a parent or legal guardian; or

(3) [Where] the defendant was a bona fide school, museum or public library, or was a person acting in the course of his employment as an employee or official of such organization or of a retail outlet affiliated with and serving the educational purpose of such organizations.

13 V.S.A. § 2805(b)(1)–(3) (1998). A related provision makes clear that a person "who engages in conduct prohibited by section[s] 2802 ... [and] 2802a ... is presumed to do so with knowledge of the character and content of the material, or the motion picture, show or presentation exhibited or to be exhibited." 13 V.S.A. § 2805(a) (1998). The law punishes violators of Sections 2802 and 2802a with up to one year in prison or a $1000.00 fine, or both. *See* 13 V.S.A. § 2807 (1998).

In August of 2001, after surviving Defendants' motion to dismiss for mootness and lack of standing, *see* Paper 31, Plaintiffs filed an amended complaint challenging newly-amended Section 2802 and newly-enacted Section 2802a. Plaintiffs maintain the changes made by Act No. 41 fail to cure the overbreadth problems created by Act No. 124. On October 22, 2001, Plaintiffs requested a preliminary or permanent injunction. At a status conference held December 17, 2001, the Court ordered a consolidated trial on the merits.

## II. *Findings of Fact*

The Court finds the following facts to be established by preponderance of the evidence.[5]

### A. *The Internet*

1. The Internet is an international network of interconnected computers. The Internet currently connects over 100 million users in over 100 countries. *See* Hr'g Ex. 9.

2. The factual basis of the United States Supreme Court's decision in *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), is still accurate today. *See* Hr'g Tr. at 26. The technology of the Internet has not changed substantially since the *Reno* decision. *See* Hr'g Tr. at 47.

3. People can access the Internet through computers located at home, work, school, or public places. *See* Hr'g Tr. at 27–28. Often there is no or little cost to access the Internet. *See Reno*, 521 U.S. at 853–54, 117 S.Ct. 2329.

### B. *The World Wide Web*

4. The best known mode of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers—called "servers"—all over the world. *See Reno*, 521 U.S. at 852, 117 S.Ct. 2329.

5. No single organization controls membership on the Web, nor is there any centralized point from which individual websites or services can be blocked. *See* Hr'g Ex. 9; *Reno*, 521 U.S. at 853, 117 S.Ct. 2329.

6. Any person or organization with a computer connected to the Internet can publish or "post" information on a particular "Web page" or "Web site." *See Reno*, 521 U.S. at 853, 117 S.Ct. 2329.

7. Technology exists by which an operator of a website may condition access on the verification of requested information such as a credit card number or password. *See Reno*, 521 U.S. at 856, 117 S.Ct. 2329. In other words, website publishers may either make their material available to the entire pool of Web users, or confine access to a selected group, such as those willing to pay for the privilege. *See Reno*, 521 U.S. at 853, 117 S.Ct. 2329.

8. The imposition of a credit card verification requirement would completely bar adults who do not have a credit card and lack the resources to obtain one from accessing any blocked material. *See Reno*, 521 U.S. at 856, 117 S.Ct. 2329.

9. Adult Check® is a commercial service available on the Web where, for a small fee and proof of age, an adult receives a password that can be used to access material on other websites

---

5. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2950 ("Since it is really a trial on the merits, in general the evidentiary rules applicable to trial should govern during a [Rule 65(a)(2)] consolidated hearing."); *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees*, 685 F.2d 1065, 1070 (9th Cir.1982) (preponderance of the evidence standard governs in civil cases involving constitutional claims), *aff'd in part, rev'd on other grounds* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

that have registered their site with Adult Check®. *See* Hr'g Tr. 46, 71.

10. Relative to the number of users of the Internet, very few people use adult age-verification passwords such as Adult Check®. There is a stigma associated with using such services. *See* Hr'g Tr. at 46–47.

11. The burdens imposed by credit card verification systems make them effectively unavailable to a substantial number of Internet content providers. *See Reno*, 521 U.S. at 857, 117 S.Ct. 2329.

12. It is virtually impossible for all Web publishers, especially those who do not use age-verification passwords or credit card registrations, to prevent their material from reaching minors without also preventing adults from reaching the material. *See* Hr'g Tr. 26.

13. It is virtually impossible for Web publishers located outside Vermont to prevent persons located in Vermont from accessing the material on their website without also preventing people from any location from accessing the material. *See* Hr'g Tr. at 27, 37.

C. *The Parties*

a. *ACLU of Vermont*

14. Plaintiff ACLU of Vermont is an affiliate of the American Civil Liberties Union ("ACLU") and its representative in Vermont. ACLU is a national organization devoted to promoting and protecting the civil liberties of all Americans and of others residing or present within the United States. ACLU of Vermont's purposes are identical to those of the ACLU, with particular emphasis on the civil liberties of Americans and others residing or present within the state of Vermont. *See* Hr'g Ex. 23, at 1.

15. The national ACLU maintains online resources on the Internet's World Wide Web, specifically a website at www.aclu.org. This website is served by a staff at the ACLU offices located outside Vermont. *See* Hr'g Ex. 23, at 2.

16. Some of the resources on the national ACLU's website contain descriptions, depictions, and/or representations of nudity, sexual conduct, and/or sexual excitement. In particular, the national ACLU's website contains material on topics such as birth control, safe sex practices, gay and lesbian rights, abortion, and sex education. Hr'g Ex. 23, at 2–3. This sexually oriented material could reasonably fall within the definition of "harmful to minors" set forth in 13 V.S.A. § 2801(6).

17. ACLU of Vermont maintains a website at members.aol.com/acluvt/home.html. The ACLU of Vermont website contains hypertext links to the homepage of the national ACLU website. *See* Hr'g Ex. 23, at 2.

18. The national ACLU and the ACLU of Vermont have a co-operative relationship, with the national organization communicating ideas and information back and forth, sometimes via the Internet, with the state organization (and vice-versa) on civil liberties issues of mutual concern. This relationship and exchange of ideas is essential to each organization's mission. *See* Hr'g Tr. at 83.

19. Any person of any age with the skill to operate a computer with an internet browser can view the websites maintained by the ACLU and ACLU of Vermont without disclosing their

true identity or paying a registration fee. *See* Hr'g Ex. 23, at 4–6.

b. *Sexual Health Network, Inc.*

20. Plaintiff Sexual Health Network, Inc. is a Delaware for-profit corporation with a principal place of business in Shelton, Connecticut.

21. Sexual Health Network, among other things, maintains a website at www.sexualhealth.com (hereinafter the "sexualhealth.com" site). The server for sexualhealth.com is located in Wallingford, Connecticut. This website can be viewed anonymously by any person of any age with an internet connection and the skill to operate a computer containing an internet browser.

22. Sexual Health Network's purpose is to provide access to sexuality-related information for people who want to learn more about sex and sexuality. In particular, Sexual Health Network tries to provide sexuality-related information to persons with disabilities, illnesses, and changes in their lifestyle. Sexual Health Network's website is central to this mission. *See* Hr'g Tr. at 49–50.

23. The sexualhealth.com website contains written information regarding a range of sexual activities and topics, including: sexual addiction; guidelines for women to assist them in achieving orgasm; advice for making safe sex practices more erotic; guidelines on the safe practice of bondage sadomasochistic activities; information for those with disabilities on how to experience sexual pleasure; and information regarding bestiality or zoophilia. *See* Hr'g Tr. at 55–64. This sexually oriented material could reasonably fall within the definition of "harmful to minors" set forth in 13 V.S.A. § 2801(6).

24. The Sexual Health Network website is visited by approximately 25,000 unique visitors each month.[6] Those visitors view approximately 140,000 pages of material maintained on the website. *See* Hr'g Tr. at 52.

25. Sexual Health Network generates revenue from advertisers who pay to have a banner advertisement displayed on the sexualhealth.com site. Sexual Health Network also generates "affiliate organization referral fee" revenues, which accrue whenever an individual viewing the sexualhealth.com site clicks on a hypertext link directing the viewer's Web browser to an affiliate organization's website. *See* Hr'g Tr. at 52–53.

26. The sexualhealth.com website also provides anonymous interactive features. For example, a visitor to the site may submit a question on a relevant topic and receive an answer from one of 40 "sex experts" affiliated with the Sexual Health Network. This question and answer feature is displayed on the website for all visitors to the site, though the identity of the questioner is not disclosed. *See* Hr'g Tr. at 68–70.

27. The interactive features of the sexualhealth.com website is important to the central mission of Sexual Health Network because it increases the likelihood of repeat visitors to the site and improves the quality of the infor-

---

**6.** The tracking or counting method employed by the sexualhealth.com site records the number of computers with different addresses which visit the site each month. Thus, an individual who visits the site on three different occasions per month using the same computer address would count as one "unique" visitor per month.

mation and advice provided on the site. *See id.*

28. Sexual Health Network does not want to use adult password services to screen material on its website because it does not want to be associated or identified with "hard-core" pornographic websites. *See* Hr'g Tr. at 71–72.

29. Sexual Health Network does not use age-verification technology on its website because the associated costs are prohibitive. *See* Hr'g Tr. at 72–73.

30. Credit card verification technology likely would significantly decrease the number and frequency of visitors to sexualhealth.com because disclosure of credit card information removes visitors' anonymity, and most visitors would not use the site unless they can do so anonymously. *See* Hr'g Tr. at 73–74.

31. Sexual Health Network, with hundreds if not thousands of unique visitors each day, has no practical or economically feasible way to obtain driver's licenses or other identifying information from visitors to its website. *See* Hr'g Tr. at 71. Even if it could process such identifying information, most users would opt to forgo visiting the site altogether if they were required to disclose their identity. *See* Hr.Tr. at 73–74.

32. Adult age verification services and credit card registration services would make information on the sexualhealth.com website less accessible to its users. *See* Hr.Tr. at 73–74.

33. There is no certainty that the individual using the verified adult password or the credit card is the person who purchased the password. *See* Hr'g Tr. 46.

## III. *Jurisdiction*

### A. *Standing*

As a preliminary matter, this Court must address whether each Plaintiff has demonstrated standing to bring its claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (the party seeking federal jurisdiction always bears the burden of establishing its standing). Although the Court dealt with the issue of standing in an earlier Opinion and Order, *see* Paper 31, it must do so once again because of Defendants' current arguments presented in their proposed findings of fact and conclusions of law. Moreover, the Court has an independent obligation to examine its subject-matter jurisdiction at all successive stages of litigation. *See Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir.1994).

Article III of the Constitution, which limits federal judicial power to the adjudication of "Cases" and "Controversies," *see* U.S. Const. art. III, § 2, is the basis for the constitutional elements of the standing doctrine. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Supreme Court explained that

> to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180–81, 120 S.Ct. 693 (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130).

A plaintiff bringing a pre-enforcement facial challenge under the First Amendment against a statute which punishes violators with civil or criminal sanctions need not demonstrate to a certainty that it will be prosecuted under the statute in order to establish injury in fact. *See Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)). Rather, a plaintiff will satisfy the "injury" requirement if it demonstrates merely a *credible or well-founded fear* that the statute will be enforced against it. *See id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).

A plaintiff demonstrates proof of a credible or well-founded fear of prosecution if the statute in question can reasonably be construed to cover the expressive or communicative activities in which a plaintiff presently engages or reasonably intends to engage in the future. *See id.* at 380–83; *Babbitt*, 442 U.S. at 299–300, 99 S.Ct. 2301; *Landell v. Sorrell*, 118 F.Supp.2d 459, 475–76 (D.Vt.2000). *Compare Fifth Ave. Peace Parade Comm. v. Gray*, 480 F.2d 326, 331 (2d Cir.1973) (holding that unsubstantiated "[a]llegations of a subjective 'chill'" do not establish an injury in fact).

The government's contention that it does not intend to charge the plaintiff under the statute does not—as a matter of standing doctrine—negate the plaintiff's reasonable fear of prosecution. *See Right to Life*, 221 F.3d at 383; *cf. Babbitt*, 442 U.S. at 298–99, 99 S.Ct. 2301 (suggesting a

credible threat of prosecution may exist so long as "'prosecution is remotely possible'") (quoting *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)).

The requirements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. As such, each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

Thus, at the trial stage, particularly where—as in this case—the defendant contests the bases for standing,[7] the plaintiff bears the burden of establishing that the elements of standing are satisfied by a preponderance of "the evidence adduced at trial." *Id.* (citing *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)); *see ACLU–New Jersey v. Township of Wall*, 246 F.3d 258, 261 (3d Cir.2001) ("As this appeal comes to us after full litigation on the merits, plaintiffs must establish standing in the same manner as would be required to prevail on the ultimate merits of their case."). *Cf. Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990) (where *prima facie* showing of personal jurisdiction is disputed, plaintiff must prove at hearing the existence of personal jurisdiction by a preponderance of the evidence); *Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1298–1301 (10th Cir.1980) (plaintiff's burden to prove standing by a preponderance of the

---

7. *See* Defendants' Answer (Paper 34), at §§ 25–33, 149–50, denying the factual bases of standing set forth in Plaintiffs' Amended Complaint. The Court recognizes that the numbering of the paragraphs in Defendants' Answer do not appear to correspond exactly with each of the numbered allegations in support of standing contained in the Amended Complaint, but this error is not an admission or waiver, particularly since Defendants repeatedly pressed dismissal for lack of standing at each stage of this case.

evidence at consolidated Rule 65(a)(2) hearing is not waived unless defendant's answer, due prior to hearing, fails to deny factual basis for standing).[8]

### 1. *Sexual Health Network, Inc.*

Sexual Health Network sues on its own behalf and on behalf of users of its website.

### a. *Section 2802a*

■ Sexual Health Network maintains it faces a credible threat of prosecution under Section 2802a for three related reasons. First, sexualhealth.com contains sexually explicit material that falls within the definition of "harmful to minors." Second, sexualhealth.com is easily accessible to minors in the state of Vermont. Third, since there is no effective way for Sexual Health Network to check age-verifying identification documents of persons who access its website, the affirmative defense under 13 V.S.A. § 2805(b)(1) is unavailable.

The Defendants argue Section 2802a can be distinguished from those state "Internet pornography" statutes found unconstitutional in other courts. To face prosecution under Section 2802a, an individual must have "actual knowledge" that the recipient of the harmful material is a minor. According to Defendants, Section 2802a does *not* prohibit the dissemination of sexually explicit, "harmful to minors" material over the Web, even if the website operator is reasonably certain its material is "harmful to minors" and will be accessed by a minor. Defendants point out that "[u]nder Vermont law[,] 'actual knowledge' is more than constructive knowledge in that actual knowledge is determined by a subjective rather than objective standard. . . ." Paper 60, at 19 (citing *State v. Moffitt*, 156 Vt. 379, 592 A.2d 894 (1991)).

Sexual Health Network does not suggest that any of its past, current, or likely future communications involve the dissemination to minors over the Internet of sexually explicit, "harmful to minors" material, with actual knowledge that the recipient is a minor. According to Defendants, therefore, Sexual Health Network is not a target of Section 2802a and does not face a credible threat of prosecution.

In *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), however, a case involving a facial challenge to similarly-worded federal statutory provisions, the Supreme Court rejected the government's argument that the law was narrow in scope and therefore did not impermissibly chill protected speech between adults. The statute at issue in *Reno*, the Communications Decency Act ("CDA"), criminalized

> the transmission [via telecommunications device] of any comment, request, suggestion, proposal, image, or other communication which is obscene and indecent, *knowing that the recipient of the communication is under 18 years of age.*

47 U.S.C. § 223(a)(B)(ii) (Supp. V 1999) (emphasis added). In a related section,

---

**8.** Plaintiffs American Booksellers Foundation For Free Expression, Association of American Publishers, Freedom to Read Foundation, National Association of Recording Merchandisers, Northshire Information, Inc., PSINet, Inc., and Recording Industry Association of America failed to present *any* evidence during trial to demonstrate standing. The Court declines to rely on these Plaintiffs' allegations in support of standing contained in their Amended Complaint, particularly since the allegations are contested by Defendants. In particular, the Court denies the requested admission of Plaintiff's Exhibit 22 (Decl. of John LoGalbo on behalf of Plaintiff PSNet, Inc.). Accordingly, these Plaintiffs are dismissed from this case.

the CDA criminalized the knowing use of "an interactive computer service to send to a *specific person or persons under 18 years of age* ... any ... image ... that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards," sexual activities. 47 U.S.C. § 223(d)(1)(A)–(B) (Supp. V 1999) (emphasis added). The Supreme Court addressed the constitutionality of these provisions as follows:

> The Government also asserts that the "knowledge" requirement of both §§ 223(a) and (d), especially when coupled with the "specific child" element found in § 223(d), saves the CDA from overbreadth. Because both sections prohibit the dissemination of indecent messages only to persons known to be under 18, the Government argues, it does not require transmitters to "refrain from communicating indecent material to adults; they need only refrain from disseminating such materials to persons they know to be under 18." Brief of Appellants 23. This argument ignores the fact that most Internet forums—including chat rooms, newsgroups, mail exploders, and the Web—are open to all comers. The Government's assertion that the knowledge requirement somehow protects the communications of adults is therefore untenable. Even the strongest reading of the "specific person" requirement of § 223(d) cannot save the statute. It would confer broad powers of censorship, in the form of a "heckler's veto," upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17–year–old child—a "specific person ... under 18 years of age," 47 U.S.C.A. § 223(d)(1)(A)—would be present.

521 U.S. at 880, 117 S.Ct. 2329 (emphasis added).[9]

In this case, Sexual Health Network faces a credible threat of a heckler's veto, which—given the nature of the content available on its website—has the same chilling effect as a credible threat of prosecution. Sexual Health Network, therefore, has standing to challenge Section 2802a.

### b. *Section 2802*

■ Section 2802 expressly prohibits the distribution or sale—to a minor *in the presence of the minor*—sexually explicit, "harmful to minors" material stored in electronic format. The provision plainly does not apply to Internet communications. Indeed, in most respects, Section 2802 is like any law prohibiting bookstore owners from selling non-obscene, "adult" magazines to a minor. *Cf. Ginsberg*, 390 U.S. at 634 (upholding restriction on direct commercial sale to minors of "harmful to minors" material because the restriction "does not bar the [store owner] from stocking the magazines and selling them" only to adults); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989) (same). The only distinction is that Section 2802 covers the distribution or sale of sexually explicit materials *when the materials are stored in electronic format*—e.g., floppy disk, CD, or hard drive.

Sexual Health Network has not proven, much less alleged, that it engages or will likely engage in face-to-face distribution of "harmful" materials to minors, whether stored in electronic format or not. It nevertheless asserts that 13 V.S.A. § 2, Vermont's criminal jurisdiction provision, extends the reach of Section 2802 to cover

**9.** *Cf. Cyberspace, Communications, Inc. v. Engler,* 142 F.Supp.2d 827 (E.D.Mich.2001) (permanently enjoining statute prohibiting the "knowing[ ] disseminat[ion] to a minor sexually explicit visual or verbal material that is harmful to minors").

Internet communications. The Court disagrees.

In relevant part, 13 V.S.A. § 2 provides: "A crime committed *by means of an electronic communication,* including a telephonic communication, shall be considered to have been committed at either the place where the communication originated or the place where it was received." 13 V.S.A. § 2 (2001 Supp.) (emphasis added). By contrast, Section 2802 does not criminalize electronic *communications,* but rather the face-to-face *distribution* or sale of harmful material *stored* electronically. Indeed, the Act No. 41 amendments to Section 2802 deleted the words "communicated" and "transmitted," in order to clarify that the law only covered face-to-face, "in the presence of a minor" conduct. *See* 2001 Vt. Acts & Resolves 41. Act No. 41 even added a new subsection to Section 2802 to clarify the scope of the provision: "This section shall apply only to acts occurring in the presence of the minor." 13 V.S.A. § 2802(c) (2001 Supp.).

In sum, Section 2802 does not cover Sexual Health Network's speech over the Internet. Accordingly, Sexual Health Network lacks standing to challenge that provision.[10]

**2.** *ACLU of Vermont*

**a.** *Section 2802a*

■ Unlike Sexual Health Network, ACLU of Vermont is not a for-profit business enterprise, but a membership-based advocacy organization. Accordingly, ACLU of Vermont must also establish standing in its own right. *See Sec'y of Interior v. California,* 464 U.S. 312, 319 n. 3, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).

ACLU of Vermont sues on its own behalf and on behalf of its members and others who use its online computer communications systems. The Executive Director of ACLU of Vermont, Benson Scotch, testified that neither the organization nor any of its members had been subject to a "heckler's veto" in connection with Section 2802a. Indeed, Scotch conceded that ACLU of Vermont's website is free of sexually explicit materials.

Scotch also credibly testified, however, that ACLU of Vermont has a close working relationship with the national ACLU, which entails a regular exchange of information on a range of civil liberties issues. The national ACLU's website contains material on topics such as birth control, safe sex practices, gay and lesbian rights, abortion, and sex education. This material could be reasonably construed to fall under

---

**10.** By the same reasoning, the Court finds that none of the other Plaintiffs have established standing to challenge Section 2802. The Court recognizes that "in the First Amendment context, . . . litigants 'are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *ACLU v. Reno,* 31 F.Supp.2d 473, 481 (E.D.Pa.1999) (quoting *Am. Booksellers,* 484 U.S. at 393, 108 S.Ct. 636). However, Sexual Health Network offers no evidence or meritorious argument—and the Court is unwilling to conjecture—that Section 2802's

prohibition on the face-to-face distribution of sexually explicit, "harmful to minors" material will cause any individual, organization or business to refrain from constitutionally protected speech. *Cf. Ginsberg, supra; New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Accordingly, the overbreadth exception to the traditional standing doctrine—which is considered "strong medicine," "a last resort," and therefore "not casually employed"—is inapplicable here. *Los Angeles Police Dep't v. United Reporting Publ'g Corp.,* 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999).

the "harmful to minors" definition; thus, the national ACLU could be subject to a "heckler's veto."

Because ACLU of Vermont and its members depend on the national ACLU's website and the open exchange of online information between the two groups, any chill on online speech experienced by the national ACLU because of a "heckler's veto" would negatively impact the ability of ACLU of Vermont and its members to receive constitutionally protected, "harmful to minors" speech. This impact on ACLU of Vermont—as an organization dedicated to learning, teaching and preserving the civil liberties of Vermonters—is a cognizable harm sufficient to give the organization standing to challenge Section 2802a. *Cf. Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 299–300, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Community Nutrition Inst. v. Block,* 698 F.2d 1239, 1252–54 (D.C.Cir.1983), *rev'd on other grounds* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649–51 (2d Cir.1998); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904–05 (2d Cir. 1993). Even if the harm were only experienced by the individual members of ACLU of Vermont, the organization would still likely have standing to bring this action on its members' behalf. *Cf. Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### B. *Abstention or Certification*

■ "It is axiomatic that ... federal courts should, where possible, avoid reaching constitutional questions." *Allstate Ins. Co. v. Serio,* 261 F.3d 143, 149–50 (2d Cir.2001). "This canon of constitutional avoidance manifests itself in a variety of ways." *Id.* at 150. "Two practices in particular—'*Pullman* abstention' and certification—can be used by federal courts to avoid (a) premature decisions on questions of federal constitutional law, and (b) erroneous rulings with respect to state law." *Id.*

*Pullman* abstention [11] is only appropriate, however, "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Right to Life,* 221 F.3d at 384 (citations and internal quotations omitted). Indeed, *Pullman* abstention " 'is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law.' " *Id.* at 385 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). The abstention doctrine applies only where the challenged state law "is susceptible 'to an interpretation by a state court that would avoid or modify the federal constitutional issue.' " *Id.* (quoting *Greater New York Metro. Food Council v. McGuire,* 6 F.3d 75, 77 (2d Cir.1993) (*per curiam* )); *see also Planned Parenthood Ass'n v. Ashcroft,* 462 U.S. 476, 493 n. 21, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). And " '[i]n the context of First Amendment claims, *Pullman* abstention has generally been *disfavored* where state statutes have been subjected to facial challenges.' " *Id.* (quoting *Bad Frog Brewery, Inc. v. New York State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir.1998)).

■ "Like abstention, certification is appropriate in those circumstances where the state statute is susceptible of an interpretation that would eliminate the constitutional issue and terminate the litigation."

---

**11.** *See R.R. Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

*Serio,* 261 F.3d at 151 (internal quotations and citations omitted); *see also Baggett,* 377 U.S. at 377, 84 S.Ct. 1316 ("Given the shared goals of *Pullman* abstention and of the device of certification, the factors counseling the former are also suggestive of when the latter is desirable.").[12]

■ The Court finds no grounds for certification or abstention. Section 2802a is not fairly susceptible of an interpretation that would avoid reaching the constitutional issues presented. There are no difficult or unsettled questions relating to the interpretation or construction of Section 2802a that would make certification or abstention appropriate.

## IV. *Conclusions of Law*

### A. *Constitutionality of Section 2802a*

#### 1. *First Amendment Challenge*

■ "In evaluating the free speech rights of adults," the Supreme Court has "made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'" *Reno,* 521 U.S. at 874, 117 S.Ct. 2329 (quoting *Sable Communications of Calif., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). Because Section 2802a is a content-based restriction on protected speech, it is presumptively invalid and can be upheld only if Defendants prove it is an effective and " 'precisely drawn means of serving a compelling state interest.'" *Able v. United States,* 88 F.3d 1280, 1296 (2d Cir.1996)

(quoting *Consol. Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)); *see United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813–17, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 450 (2d Cir.2001) (citing *Sable,* 492 U.S. at 126, 109 S.Ct. 2829).

Vermont evidently enacted Section 2802a to stop pedophiles from using the Internet to facilitate sexual assaults of minors.[13] Defendants' primary witness, a police officer with experience in prosecuting sexual predators of children, testified that Section 2802a can be used to address the practice known as "grooming"—the process child sexual predators use to gain the trust and lower the sexual inhibitions of potential child victims. *See* Hr'g Tr. at 111. A key stage in the grooming process involves the distribution of sexually explicit materials to a potential victim in an attempt to condition the victim's view toward sex and sexual behavior. *See id.* The Internet—in part because it allows a high degree of anonymity between users—has unfortunately proven to be an especially effective medium through which child sexual predators use sexual material to groom their victims. *See id.* at 112–14.

Clearly, Vermont's interest in protecting minors from predatory, Internet-based grooming practices is compelling. *See Reno,* 521 U.S. at 875, 117 S.Ct. 2329; *FCC v. Pacifica Found.,* 438 U.S. 726, 749,

---

12. Between the two options, however, certification is usually preferable, since it reduces the delay and costs associated with commencing new litigation in state court. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 75–76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Serio,* 261 F.3d at 151–52 (listing other reasons to favor certification).

13. To be clear, Section 2802a is not an attempt to address child pornography, a harm

covered by 13 V.S.A. §§ 2821–2827 (1998 & 2001 Supp.), and 18 U.S.C. §§ 2252–2252A. If the State's interest is broader—*e.g.,* preventing minors from obtaining pornography on the Internet—the State's primary witness conceded that Section 2802a would "probably not" have any effect because "there is such an enormous amount of [pornographic] material out there that it's technologically and realistically impossible." Hr'g Tr. at 137.

98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Ginsberg*, 390 U.S. at 639, 88 S.Ct. 1274. Section 2802a is nevertheless invalid, however, because it broadly restricts indecent—though constitutionally protected—speech by adults in an attempt to restrict that speech from reaching minors. *Compare Ashcroft v. Free Speech Coalition*, No. 00–795, slip op. at 14, 535 U.S. ——, ——, 122 S.Ct. 1389, 1394, —— L.Ed.2d —— (Apr. 16, 2002) ("[S]peech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it."); *Playboy*, 529 U.S. at 814, 120 S.Ct. 1878 ("[E]ven where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if protection can be accomplished by a less restrictive alternative."); *Reno*, 521 U.S. at 875, 117 S.Ct. 2329 ("[T]he governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults.").

First, as Defendants' primary witness conceded, there is no language in Section 2802a that limits its scope to the practice of grooming or to the transmission of harmful material to a minor with the intent of facilitating the sexual exploitation of the minor. *See* Hr'g Tr. at 139. The statute is actually very broad in scope. For example, by defining "harmful to minors" as that which "[i]s patently offensive to the prevailing standards in the adult community in the state of Vermont as a whole with respect to what is suitable material for minors," 13 V.S.A. § 2801(6)(B), the law forces every speaker on the Internet *in every state or community in the United States* to abide by Vermont's standards, even if the online speech would not be found "harmful to minors" in any other location.

To paraphrase the Supreme Court, it is neither realistic nor constitutionally sound to read the First Amendment as forcing the people of New York City or San Francisco to restrict their speech to abide by what is deemed acceptable speech in Vermont. *See Miller v. California*, 413 U.S. 15, 32, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). "People in different States vary in their tastes and attitudes and this diversity is not to be strangled by the absolutism of imposed uniformity." *Id.* at 33, 93 S.Ct. 2607; *see also ACLU v. Reno*, 929 F.Supp. 824, 852–53 (E.D.Pa.1996).[14] Further, the "actual knowledge" requirement is of no help here; as noted in *Reno*, the unique nature of Internet communications means that online speakers cannot readily verify the age of an online "heckler" nefariously seeking to chill and suppress certain online speech.[15]

**14.** In the context of statutes that regulate pornographic material transmitted through traditional modes of communication, *e.g.* mail or telephone, subjecting speakers to varying community standards is not constitutionally problematic. *See Hamling v. United States*, 418 U.S. 87, 106, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (mail distributors); *Sable*, 492 U.S. at 125–26, 109 S.Ct. 2829 ("dial-a-porn" telephone service). In *Hamling* and *Sable*, the defendants could reasonably limit the distribution of material to specific geographic locations, and thereby reduce their exposure to liability by avoiding communities with more restrictive standards. In contrast, Web publishers cannot restrict access to their sites based on the geographic location of their users. Thus, website operators in other states could reasonably face prosecution in Vermont, so long as they can be extradited to Vermont.

**15.** Apart from their interpretation of the "actual knowledge" requirement, Defendants offer no narrowing construction of Section 2802a to save it from constitutional scrutiny. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. at 397, 108 S.Ct. 636 ("[I]n determining a facial challenge to a statute [under the First Amendment], if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld."); *Erznoznik*

The statute also lacks practical safe harbors or exceptions for most Web operators. With the exception of bona fide public libraries, museums, and educational institutions, *see* 13 V.S.A. § 2805(b)(3)— and unlike the law upheld in *Ginsberg* — Section 2802a applies to all *noncommercial* entities and individuals that communicate on the Internet. Given the financial and practical difficulties associated with credit card verification or adult password verification services, most noncommercial—as well as some commercial—Web publishers face a heavy, if not impossible, compliance burden under Section 2802a. *Cf. Playboy,* 529 U.S. at 808, 120 S.Ct. 1878. Moreover, there is evidence that imposing these age-verification requirements on Web publishers such as Sexual Health Network—for which the anonymity of the Internet is uniquely suited— would turn most users away.[16] Thus, Section 2802a effectively drives protected and valuable speech for adults out of the "marketplace of ideas."

Furthermore, under the statute, a good faith attempt to implement a credit card verification or adult password service would not exculpate website operators. *Cf. PSINET, Inc. v. Chapman,* 167 F.Supp.2d 878, 888 (W.D.Va.2001) ("[Because the Virginia statute] does not include an affirmative defense to prosecution for commercial websites if they in fact incorporate … compliance measures …. even

the most responsible adult websites may have legitimate concerns that they will be subjected to criminal liability in the state of Virginia."). As such, a website operator which receives a "heckler's veto" would have no assurance of immunity even if it conditioned access to sexually explicit content upon the users' provision of an adult password or credit card number.

In addition, the limited affirmative defenses set forth in 13 V.S.A. § 2805(b) are unavailable to the overwhelming majority of website operators. For example, a website operator such as Sexual Health Network, which receives thousands of unique visits to its website per month, is in no position to process individual driver licenses or similar identifying information to ensure that each visitor is not a minor.

Finally, Section 2802a fails strict scrutiny analysis because Defendants fail to demonstrate why a less restrictive provision would not be as effective as Section 2802a in addressing the State's asserted interest. *See Playboy,* 529 U.S. at 818, 120 S.Ct. 1878 ("When First Amendment compliance is the point to be proved, the risk of non-persuasion—operative in all trials—must rest with the Government, not with the citizen.").

In fact, Vermont recently enacted 13 V.S.A. § 2828, which targets the "knowing[ ] utiliz[ation] [of] an electronic commu-

*v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (an overbreadth attack is 'strong medicine' and should not succeed if the statute is "readily subject to a narrowing construction"). Nor have Defendants suggested whether or how portions of the statute might be preserved through partial severance. *See* 13 V.S.A. § 2806 (instructing courts that any part or provision of 13 V.S.A. §§ 2802–2804b found unconstitutional should be severed if possible in order to survive constitutional review). Given the breadth of Section 2802a, the Court finds no "readily susceptible" way to narrow

its construction or sever a portion of it to comply with the First Amendment.

**16.** Moreover, the loss of visitors to sexualhealth.com, a site that receives revenues from advertisers that pay for advertising based on monthly viewership, is of obvious financial consequence. *See PSINET, Inc. v. Chapman,* 167 F.Supp.2d 878, 888 n. 2 (W.D.Va.2001) ("The use of adult verification systems may have a more significant financial impact on these free, but nevertheless commercial, content providers.").

nication to solicit, lure, or entice, or to attempt to solicit, lure, or entice, a child under the age of 16 ... to engage in a sexual act...." (2001 Supp.). Defendants have not persuaded the Court that vigorous enforcement of this decidedly narrower statute, *cf. People v. Foley*, 94 N.Y.2d 668, 709 N.Y.S.2d 467, 731 N.E.2d 123 (2000), would not effectively address the State's legitimate interest in protecting minors from sexual exploitation facilitated over the Internet.[17]

Defendants contend that 13 V.S.A. § 2828, unlike Section 2802a, does not cover the "mere" distribution of harmful material over the Internet to a minor *prior to* the stage at which the pedophile expressly attempts to lure or make physical contact with the victim. As Defendants' principal witness testified:

I think under [13 V.S.A. § ] 2828 it requires a specific overt act not just a conversation about sex and some sending of images or something like that, exchange of files. And we do run into cases occasionally where there is no specific overt act yet. We have someone that we know has a prior conviction as a sex offender or we can based on other background that our assessment is the person poses a danger but we're not

quite at the threshold posed by [§ ] 2828.

Hr'g Tr. at 141.

Accepting that interpretation,[18] however, only underscores the fact that Section 2802a proscribes *pure speech* on the Internet, not conduct—a very broad goal which Defendants' own expert elsewhere concedes is "technologically and realistically impossible." Hr'g Tr. at 137. Moreover, the fact that every federal and state attempt to regulate pure, "harmful to minors" speech over the Internet has been struck down as overly burdensome on adult speech suggests the Constitution may not permit such regulations.

In conclusion, because "[t]he level of discourse reaching a[n] [adult's Internet] mailbox cannot be limited to that which would be suitable for a sandbox," *Reno*, 521 U.S. at 875, 117 S.Ct. 2329 (internal quotations and citations omitted), Defendants must be enjoined from enforcing Section 2802a.

### 2. Commerce Clause Challenge

Even if Section 2802a were to survive under Plaintiffs' First Amendment challenge, however, it would be unconstitutional under the Commerce Clause.

---

**17.** Defendants also fail to rebut Plaintiffs' contention, *see* Hr'g Ex. 9, at ¶ 32–42, that a less restrictive and more effective solution lies in widely-available, user-based (*i.e.*, parental) controls on computers. *Compare Reno*, 521 U.S. at 877, 117 S.Ct. 2329 (finding the CDA overly burdensome and restrictive given the district court's finding that user-based software may soon give parents "a reasonably effective method by which [they] can prevent their children from accessing sexually explicit ... material ..."); *Playboy*, 529 U.S. at 824, 120 S.Ct. 1878 ("It is no response that voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time. A court should not assume a plausible, less restrictive alternative

would be ineffective; and a court should not presume parents, given full information, will fail to act.").

**18.** The Court finds no "overt act" requirement, however, in the statutory terms "solicit, lure, or entice." Indeed, according to Georgia Cumming, Defendants' expert in methods used by sex offenders to access victims, 13 V.S.A. § 2828 *is* directed at grooming over the Internet. *See* Hr'g Tr. at 102. Cumming's interpretation may raise questions concerning the constitutionality of 13 V.S.A. § 2828, but the Court is not addressing that issue here.

"[T]he Internet represents an instrument of commerce": it is "more than a means of communication[,] serv[ing] as a conduit for transporting digitized goods, including software, data, music, graphics, and videos which can be downloaded from the provider's site to the Internet user's computer." *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. at 173; *see also ACLU v. Johnson*, 194 F.3d at 1160–62; *cf. Planned Parenthood Fed'n of Am., Inc. v. Bucci*, No. 97 Civ. 0629(KMW), 1997 WL 133313, at *3 & n. 7 (S.D.N.Y. Mar.24, 1997). In this case, for example, Sexual Health Network's website—in particular, the visitors to the site from across the globe—is a direct source of corporate revenue.

■ The "dormant implication of the Commerce Clause prohibits state ... regulation .. that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)). The "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the state." *Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *see also Connecticut ex rel. Blumenthal v. Crotty*, 180 F.Supp.2d 392, 398–99 (N.D.N.Y.2001). The intent of the legislature in enacting the legislation is irrelevant; "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state." *Healy*, 491 U.S. at 336, 109 S.Ct. 2491. Further, "[t]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute

may interact with the legitimate regulatory regimes of other States.... Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one regulatory regime into the jurisdiction of another state." *Id.*

■ Section 2802a is a *per se* violation of the Commerce Clause because it regulates Internet commerce occurring wholly outside Vermont's borders. By its terms, Section 2802a applies to any electronic communication, intrastate or interstate, that fits within the prohibition and over which Vermont has the capacity to exercise criminal jurisdiction. *Cf. Pataki*, 969 F.Supp. at 170–71. Yet, no Web publisher outside Vermont can prevent material from flowing to users in Vermont. Thus, for example, a Web publisher in Connecticut (or any other state) must conform his communications on the Internet to Section 2802a. This constitutes a clear violation of the Commerce Clause. *Cf. Pataki*, 969 F.Supp. at 171–72; *ACLU v. Johnson*, 194 F.3d at 1161; *Cyberspace, Communications*, 55 F.Supp.2d at 751.

Moreover, given the lack of evidence as to Section 2802a's effectiveness, its local benefits appear to be outweighed by its burden on interstate commerce. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (a statute is valid under the dormant Commerce Clause "unless the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits").

Defendants attempt to support Section 2802a by primarily stressing the importance of stopping child sexual predators on the Internet. It is beyond dispute, however, that Vermont has a legitimate and serious interest in regulating online child sexual predators; the issue here is whether Section 2802a effectively and reasonably

serves that interest in comparison to its impact on interstate commerce.

Defendants' principal witness explained that police in Vermont "occasionally" "run into cases" where Section 2802a would be of benefit in stopping predatory grooming practices. Hr'g Tr. at 141. Those "occasional" cases presumably involve careful police monitoring of individuals already known and suspected to commit sexual offenses against children. *See id.* There is no evidence that these known, monitored individuals pose dangers that cannot be effectively addressed by 13 V.S.A. § 2828 or laws prohibiting the distribution of child pornography, *see* 13 V.S.A. §§ 2821–27. Defendants' witness offers only anecdotal evidence that the new provision may be effective, without addressing whether alternative, less burdensome means of regulation would be as effective. *Cf. Crotty*, 180 F.Supp.2d at 401.[19]

In contrast, the burdens imposed on Internet users in Vermont and elsewhere are significant. For example, commercial website operators such as Sexual Health Network must either remove all speech of a sexual nature that is protected for adults but arguably "harmful to minors" or else risk a heckler's veto or potential criminal prosecution. *See* Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 817 (2001) ("The criminal remedy raises a cautionary flag that the penalties imposed by [Internet pornography] statutes might excessively burden interstate commerce relative to the local benefits."). Section 2802a provides no safe harbor or good faith defense for operators that attempt to screen harmful content from minors. *Cf.*

*id.* at 816 (suggesting the decision in *Pataki* was flawed because the New York anti-pornography law contained a good faith defense for website operators, thereby imposing only a minimal chill on Internet commerce).

Given that Defendants have failed to explain whether Vermont's interest "could be promoted as well with a lesser impact on interstate activities," *Pike*, 397 U.S. at 142, 90 S.Ct. 844, Defendants have failed to demonstrate that Section 2802a's burdens are outweighed by its benefits in Vermont.

## V. *Permanent Injunction*

"The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the moving party must show actual success on the merits." *Housing Works, Inc. v. Safir*, 101 F.Supp.2d 163, 167 (S.D.N.Y. 2000), *rev'd on other grounds sub nom. Housing Works, Inc. v. Kerik*, 283 F.3d 471 (2d Cir.2002); *see also Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.) ("In deciding whether a permanent injunction should be issued, the Court must first determine if plaintiff has actually succeeded on the merits."), *aff'd without op.* 633 F.2d 206 (2d Cir.1980). Therefore, a party seeking permanent injunctive relief must demonstrate (a) actual success on the merits and (b) that it will suffer irreparable harm if the relief is denied. *See Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir.1999).

Plaintiffs have demonstrated actual success on the merits of their First Amendment and Commerce Clause claims. "Deprivation of the rights guaranteed under the Commerce Clause constitutes irrepara-

---

**19.** The Court recognizes that when applying the dormant Commerce Clause, courts should not "second-guess the empirical judgments of lawmakers concerning the utility of legislation," *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). However, Defendants in this case provide scant evidence, and certainly no rough empirical judgments, on which to conclude the new statute will be effective.

ble injury." *Pataki*, 969 F.Supp. at 168 (citing *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp. 848, 854 (S.D.N.Y.1991)). Likewise, a deprivation of First Amendment rights constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Therefore, permanent injunctive relief is warranted.

### VI. *Conclusion*

Consistent with the above Memorandum Opinion: Plaintiffs' Motion for Permanent Injunction (Paper 35) is **GRANTED IN PART** and **DENIED IN PART,** and Defendants are therefore **PERMANENTLY ENJOINED** from enforcing 13 V.S.A. § 2802a (2001 Supp.); Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Paper 42) is **GRANTED IN PART** and **DENIED IN PART;** and Plaintiffs' Motion for Judgment as a Matter of Law (Paper 55) is **DENIED.**

**SO ORDERED,**